IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

MATTA ZEINALI                              *

            Plaintiff          *

          vs.                 *   CIVIL ACTION NO. MJG-15-1599

MICHAEL PENSE                              *

        Defendant           *

*     *     *     *     *     *     *     *     *

MEMORANDUM AND ORDER

The Court has before it Defendant's Motion for Summary Judgment [ECF No. 15] and the materials submitted relating thereto.  The Court has held a hearing and received the benefit of the arguments of counsel.

I.   BACKGROUND

At all times relevant hereto, Plaintiff Matta Zeinali ("Zeinali") was employed by the Maryland Department of Public Safety and Correctional Services ("DPSCS") as an Assistant Director of Budget Management.  Zeinali claims that her former supervisor, Defendant Michael Pense ("Pense"), sexually harassed her from September 2014[1] until April 21, 2015, thereby creating a hostile work environment in violation of the Due Process and Equal Protection Clauses of the United States Constitution and Maryland State Constitution.

_____

[1]   Although the Complaint alleges that the discrimination began in September, there is no evidence of any conduct whatsoever occurring until October.

On June 2, 2015, Zeinali filed this lawsuit under 42 U.S.C. § 1983. [ECF No. 1].[2] By the instant motion, [ECF No. 15], Pense seeks summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

III. SUMMARY JUDGMENT STANDARD

A motion for summary judgment shall be granted if the pleadings and supporting documents "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The well-established principles pertinent to summary judgment motions can be distilled to a simple statement:  The Court may look at the evidence presented in regard to a motion for summary judgment through the non-movant's rose-colored glasses, but must view it realistically.  After so doing, the essential question is whether a reasonable fact finder could return a verdict for the non-movant or whether the movant would, at trial, be entitled to judgment as a matter of law.  See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Shealy v. Winston, 929 F.2d 1009, 1012 (4th Cir. 1991).  Thus,

---

[2]  She is seeking general, special, punitive and compensatory damages, plus attorneys' fees and costs.

in order to defeat a motion for summary judgment, "the party opposing the motion must present <u>evidence</u> of specific facts from which the finder of fact could reasonably find for him or her." <u>Mackey v. Shalala</u>, 43 F. Supp. 2d 559, 564 (D. Md. 1999) (emphasis added). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Anderson</u>, 477 U.S. at 249–50, 106 S. Ct. at 2511 (internal citations omitted).

When evaluating a motion for summary judgment, the Court must bear in mind that the "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" <u>Celotex</u>, 477 U.S. at 327 (quoting Rule 1 of the Federal Rules of Civil Procedure).

IV.  <u>DISCUSSION</u>

At the hearing, Plaintiff made clear her contentions that Defendant pursued a sexually-motivated physical and romantic relationship with her against her wishes, thereby creating a hostile work environment. As discussed herein, in light of the undisputed facts, no reasonable juror could conclude that Plaintiff's contentions were accurate and that Defendant sexually harassed the Plaintiff.

3

A. Undisputed Facts

Zeinali, a woman, was hired by DPSCS on August 13, 2014.[3] Pense, a sixty-year-old male, was the Director of Budget Management and Zeinali's direct supervisor.  As Pense's Assistant, Zeinali was expected to work closely with Pense, as well as supervise other employees.

In October 2014, Pense had lunch with Zeinali, along with other coworkers, three times at nearby restaurants.  Dep. of Matta Zeinali ("Zeinali Dep.") [ECF No. 19-7] at 6.  According to Pense, this was not unusual for him – he often had lunch and dinner with co-workers and supervisors. Decl. of Michael Pense ["Pense Decl."] [ECF No. 15-3] at ¶ 5; Decl. of Tekia Jackson [ECF No. 15-2, Ex. C] at 28, ¶ 8.

On January 7, 2015, Pense invited Zeinali to have dinner at a local diner after working late, and Zeinali went.  During the dinner, Pense said, "What does your husband think of this?" and "We don't have to do this all the time, there are other things we can do." IID Report [ECF No. 19-5] at 10.  Zeinali claims that these comments made her uncomfortable. Id.

---

[3]    Prior to being hired at DPSCS, Zeinali resigned from her previous job at the Department of Housing and Community Development in lieu of being terminated for poor performance. [ECF No. 15-2, Ex. G]. DPSCS hired her at Pense's insistence because he thought he could teach her despite her inadequate work history. Pense Decl. [ECF 15-3] at ¶ 8.  Her position at DPSCS was at a lower pay grade. [ECF No. 15-2, Ex. L].

The next day Pense arrived at work at 8:49 AM and noticed that Zeinali was not yet in her office.  Later that day, Zeinali told Pense that she arrived at 8:40 AM.  He checked her time sheet and found that she reported that she arrived at 8:30 AM. After this incident Pense began to closely monitor Zeinali's arrivals and departures to determine if she was accurately reporting her time.  Pense also tracked the arrivals and departures of his other Assistant, Tekia Jackson. Pense Decl. [ECF No. 15-3] at ¶ 13.  He told his supervisor, Jerri Nolet, that he was monitoring Zeinali's attendance because he questioned her integrity. Id.

On January 13, 2015, Pense confronted Zeinali about not correctly completing a journal entry, and Zeinali became upset. Pense Decl. [ECF No. 15-3] at ¶ 16.  Zeinali did not learn from Pense's instructions, and Pense had to ask Ms. Jackson and another employee to train Zeinali. Id. at ¶ 17.  The record reveals that Pense had a "tendency at times to get frustrated with people who did not listen to him or who were incompetent" and would "raise his voice and become critical." Decl. of Sue Dooley [ECF No. 15-2, Ex. B] at ¶ 10.

On January 15, Pense invited Zeinali to lunch, but she declined. MCCR Complaint [ECF No. 15-2, Ex. K] at 111.  The next day Pense denied Zeinali's leave request for March 30 to April 4 because it was "projection review week" in the office.  Pense

5

Decl. [ECF No. 15-3] at ¶ 18.  Employees were discouraged from taking vacation during projection review week.  See Nolet Decl. [ECF No. 15-2, Ex. A] at ¶ 13.  Bonnie Keller, a co-worker and Zeinali's friend, confirmed in a message to Zeinali that, "projection week is serious, You will just have to deal with that one. They are strict on projections." [ECF No. 15-2, Ex. M] at 168.  When Zeinali complained about the denial, Pense granted her leave request after Zeinali promised to stay late to complete her assignments before she left. Pense Decl. [ECF No. 15-3] at ¶ 19; [ECF No. 15-3, Ex. G].

A few days later, Pense texted Zeinali to offer her a ride to and from work because the roads were icy and Zeinali had previously expressed that she was uncomfortable driving in icy conditions.  Pense Decl. [ECF No 15-3] at ¶ 21.  Zeinali did not respond to Pense's offer.  [ECF No 15-3, Ex. H].  The next day, January 21, Pense, Zeinali, and Nolet met to discuss Zeinali's work performance and time cards.  Pense Decl., at ¶ 23.  At this time, Pense and Nolet imposed strict reporting requirements on Zeinali in that she was required to email Pense every day when she arrived and departed.  These reporting conditions lasted from January 21 to February 4, 2015.  Throughout this time, Zeinali complained about Pense, his managing style, and reporting requirements to Keller.  See, e.g., [ECF No. 15-2, Ex. M] at 144 ("He expects me to do every step as he would do.. I am

fig him out and its not good. He truly expects me to do every
step as he does. He must be very stressed out over it."); Id. at
1327 ("I pray I report to someone new soon. I don't want to
leave... just a wish.").

On February 4, Pense met with Zeinali in his office.  At
the meeting Pense read from the following note:

> I am going to take back all of the requirements I
> imposed upon you two weeks ago. I do not know
> totally why you have been so upset at me the past
> month or so. I do know I have been upset at you. I
> am not going to play these games anymore. I'm going
> to give up being friendly to you. I will be
> professional and courteous. But I cannot promise you
> that I will not get mad. I get mad at everybody
> sometimes. You just have to get over it. I have bent
> over backwards for you. I went out on a limb for
> you. I got you everything you wanted when you
> started. I have been nicer to you than I have been
> to just about everybody in this place. And now I
> feel I have been stabbed in my back. I have never
> said or done anything inappropriate to you. I have
> never done anything wrong to you. And I am
> infuriated that anybody thinks that I have. I
> offered you a ride and to share a meal as work
> friends. I did not ask you on a date. You can't talk
> to me? I'm done! I will send you an email removing
> the requirements I imposed upon you two weeks ago.

Pense Decl. [ECF 15-3, Ex. J] at 43.

On February 10, Zeinali attended work training at another
facility. Before the training, Pense asked Zeinali if he could
give her a tour of the facility and if she could have lunch with
him so that he could introduce her to his former clerk.
Plaintiff's Responses to Defendant's First Set of
Interrogatories [ECF No. 19-6] at 6-7.  However, at the end of

7

the training session, Zeinali left without telling Pense and returned to her office instead of staying for lunch. Id.  Pense was angry that she did not go to lunch with him. Id. at 7. Zeinali claims that at this time she began to think Pense was romantically interested in her. Zeinali Dep. [ECF No. 15-2, Ex. D] at 42-43.

Pense's dissatisfaction with Zeinali's work continued.  On February 11, Pense emailed Nolet expressing hesitation about ending Zeinali's probationary period.  Pense confided:

> [Matta Zeinali] seems always afraid of me like I am always telling her she is doing something wrong. . . .  I believe she is just flat out scared of me. I think she is also scared of you.
>
> I will get over not being friends with her. But how will we (all of us) be able to work together if Matta is always thinking she is being scolding for not doing something exactly right. I can only give so much lavish praise. . . .  I am beginning to rethink approving the probation. I am wondering if it will be better for Matta to leave DPSCS to get away from both Bonnie [Keller] and me. This would break my heart as I do not want to see Matta leave nor do I want to see her out of a job.
>
> [ECF 15-3, Ex. L] at 49.

On February 12, Zeinali met with Nolet and told her, "Mike wants to date me."  Nolet told her "Mike doesn't want to take your husband's place." IID Report [ECF No. 19-5] at 11.

A few days later, Zeinali met with Pense and complained that he was micromanaging her and also questioned him about taking time off work to care for her sick daughter.  On February

14, Pense completed Zeinali's probationary evaluation form. [ECF No. 15-2, Ex. R] at 213.  In his evaluation, Pense wrote:

> As a supervisor I feel in [sic] I am in a compromised position. Matta thinks I have acted inappropriately. Matta has also accused me of not allowing her to take leave for health reasons due to the fact it would compromise her work. Both of these accusations are false. She thinks I "micro manager" her and just about anything I say I am considered "complaining". Matta has had just about every job duty taught to her since she has started in this position. Very little of Matta's fifteen years of experience has apply to any of her duties. I was aware that this was a possibility and that I would be responsible for instructing her. Now there is a strained relationship between us making her performance questionable. I have just another accountant not an Assistant Director of Budget Management. I have serious doubts that her performance will ever be at a level of an Assistant Director of Budget Management.
>
> Her organizational skills are awful. Just one look at her desk and you wonder how she finds anything. Twice Robbie Fitzgerald, a contractual intern almost did not get paid due to a misplace timesheet and lack of proper instructions being forwarded. Her notes are scatter [sic] amongst all of the papers on her desk. She states that she types them. But when question about duties / documentation that were performed / created/ reviewed months ago she does not remember. . . . She does not understand the assignments that are given to her well enough to properly prioritize them.
>
> ***
>
> She had to be taught to do a journal entry, a simple accountant 101 task, and instead of getting proper assistance she ask a Robbie Fitzgerald, a contractual intern for assistance. Robbie, who was still learning himself, showed her the pieces he knew as she created, entered, and released a journal entry. The backup for the journal entry was woefully inadequate . . . .

Id.

Pense did other things that made Zeinali uncomfortable in the time period between October 2014 and March 2015. He made remarks inviting her and her daughter to go hiking with him and his nephew. He also spent "a lot of time" in Zeinali's office and talked to her "about personal matters and tr[ied] to convince [her] to be his friend and how it was important for [them] to be close." Zeinali Dep. [ECF No. 15-2, Ex. D] at 48.

On two occasions, Pense briefly "touched" and/or "rubbed against" Zeinali's knee/legs as they were sitting in chairs close to each other working at the same computer. Zeinali Dep. [ECF 19-7] at 4. He also touched her chest with his arm or body on "several" occasions when he was reaching over her to point out something on the computer. Id.; Dep. of Bonnie Keller [ECF No. 15-2] at 93. "[E]ach time he would act like it was an accident," like he bumped into her, but Zeinali asked him to stop and not sit so close to her. Plaintiff's Responses to Defendant's First Set of Interrogatories [ECF No. 19-6] at 3-4, 9. "[H]e still kept acting like he was innocent and he would still sit close to her so eventually Zeinali moved the chair so that he would know not to sit next to her." Id. at 4.

Pense also commented on Zeinali's looks.  He told her she was "pretty" "about five to seven times." Id. at 54.  Once, Pense asked Zeinali if she washed her hair every day, and on another occasion when Zeinali was complaining about makeup,

Pense told her she does not need to wear makeup. Id.; Pense Dep. [ECF No. 19-3] at 74.  During meetings and trainings, Pense would make comments such as, "I really like you" and "I am enjoying this." Defendant's First Set of Interrogatories [ECF No. 19-6] at 9.  One time when Pense was sitting in Zeinali's office, he "grabbed his collar and moved his hand back and forth as if he were trying to open his collar and said, 'Do you feel this, can't you feel it, there is something here.'" Id. at 10. Zeinali claims these actions were sexual advances and evidence of Pense's desire to have a relationship with her.  Id.

On March 6, 2015, a liberal leave day in the office due to bad weather, Pense asked Zeinali to go to lunch, but she refused.  Zeinali Dep. [ECF No. 15-2, Ex. D] at 70.

On March 25, Pense and Zeinali argued over scheduling. After Zeinali left Pense's office, Pense entered her office and yelled that he "d[id] not appreciate her attitude and d[id] not want to hear it anymore." [ECF No. 15-3, Ex. P] at 60.  Zeinali stated that Pense's actions scared her.  IID Report [ECF No. 19-5] at 13.  Zeinali reported Pense's behavior to Nolet.  Id.

On March 26, Pense and Zeinali met to discuss other matters. At this time, Zeinali asked Pense if he wanted her to leave his unit. He told her "no" and apologized. Then he asked Zeinali if she wanted to go to dinner to discuss the issue, but she refused. Pense Decl. [ECF No. 15-3] at ¶ 42.

11

The next morning Pense put a store-bought card on Zeinali's desk. The card said: "Something went wrong. I'm pretty sure it was me. I'm sorry." Pense inscribed underneath, "Please talk to me. Mike". [ECF No. 15-3, Ex. Q] at 62-63.  Additionally, inside the card was a sheet of paper with a typewritten message from Pense, which read:

Matta:

You asked me if I wanted you to leave. Emphatically NO! I do not want you to leave. I do not want you to leave work nor do I want you to leave my life. But we cannot keep hurting each other. I will take some and maybe most of the blame if that will help you forgive me. But you have to take some blame too. We are both so highly emotional individuals with a huge desire to succeed. And you have to admit we are both very demanding and stubborn. I will give in if and when you have a good argument or are able to prove me wrong. But you have to give in also when I have a good argument and not just because I am your boss. I do not want to hurt you. I have never intended to do so. But you were not the only one hurt. I feel you have shut me out. I feel you do not want to talk to me. You told me you did this to your sister after Thanksgiving.  I cannot  handle  being  shut  out especially  when  that  is  mostly  what  my  job  is.  I have enjoyed our conversations immensely. I find you fascinating. All  of  the  complements  [sic]  I  have given you (especially the ones that make you blush) come  from  my  heart.  Every  time  you  come  into  my office  to  ask  me  a  question  I  am  so  happy  inside.  I do  not  understand  why  you  think  I  am  always  mad  at you. The  further  could  be  the  truth.  Please  stop assuming  that  you  are  "in  trouble"  all  of  the  time. If  you  think  you  are  in  trouble  ask  me.  And  please trust  me  when  I  tell  you  "No,  you  are  not  in trouble".  I  will  do  my  best  to  listen  to  you  and ease  your  concerns  and  worries.  Please  believe  me when  I  tell  you  I  want  to  help  you.  I  have  been doing  this  same  job  for  over  fifteen  years.  I  seldom give up on anything I set out to do and I am asking

you to not give up on me. Work with me. Learn my
habits. And eventually you will see a very nice guy
with a gruff protective exterior. I will do most
anything to protect the ones I care about.

I am willing to put in the extra effort into making
our working relationship and our friendship grow but
you have to also. Please come talk me. I want to
answer all of your questions no matter how busy I
am. I want to know all about you; tell me about your
daughter, your latest shopping spree, or whatever.
I'll even listen to you vent if you are mad about
something or at someone (including me). And most of
all tell me what I need to do to fix things.

I have a little sister whom I am so very proud of.
But I still have room in my heart for another little
sister just like you!

Id. at 64 (emphasis added).

Zeinali did not mention the note to Pense. Later, Pense

asked her what she thought of the note. Zeinali responded,

"[a]re you trying to be nice to me now?" Zeinali Dep. [ECF 15-2,

Ex. D] at 56.  Pense did not reply, and they never discussed the

note again.[4]

On April 21, 2015, Zeinali spoke with the DPSCS Office of

Equal Opportunity ("OEO") regarding allegations of Pense

sexually harassing her.  The OEO gave Zeinali information on how

to file a formal complaint, but Zeinali declined to do so and

would not cooperate with the OEO.  Nevertheless, Pense was

immediately transferred to a different office and was ordered to

have no contact with Zeinali while the OEO conducted an

---

[4]    Pense and Zeinali were not together in the office from
March 30 to April 10 because of their vacations.

investigation. OEO made a preliminary finding that "given the mere existence of the claim itself it is clear that Mr. Pense has, at a minimum, created an intimidating, hostile, or offensive work environment and the card and letter are proof of that fact." OEO Preliminary Finding [ECF 19-10] at 5. This finding was only preliminary, and no formal finding of sexual harassment was made by OEO as the investigation was completed by the DPSCS Internal Investigative Division ("IID"). Decl. of Karen Shipley [ECF No. 20-2] at ¶ 8.

Three IID investigators interviewed Pense, Zeinali, and other employees, and reviewed emails and other relevant documents. IID Report [ECF No. 19-3] at 3-4. In her interview, Zeinali said she had never discussed with Pense that she found his remarks or behaviors inappropriate or told him she did not want a relationship outside of work, but she did refuse his invitations to spend time together. Id. at 11. Prior to this incident, no other person had made a sexual harassment complaint against Pense.[5] Nolet Decl. [ECF No. 15-2, Ex. A] at ¶ 7.

---

[5]    Zeinali submitted the testimony of Bonnie Keller, another employee who works in the DPSCS office, who stated that a former intern claimed that Pense sexually harassed her by "stalking her" and "asking her out" and that she heard similar "rumors" about another intern. This is hearsay and therefore not suitable to be considered for summary judgment purposes. See Fed. R. Civ. P. 56 ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

On June 2, 2015, Zeinali filed the instant lawsuit.  On June 29, 2015, Pense was terminated from DPSCS.[6] On or about July 14, 2015, the IID concluded its investigation and determined that Pense's actions "did not constitute a hostile work environment" and that he did not make "any unwanted sexual advances toward Ms. Zeinali." Decl. of William Sage [ECF No. 15-4] at ¶¶ 8-9.

B. Section 1983 Sexual Harassment Claim

To establish a claim under § 1983, a plaintiff must show that a person acting under color of state law violated a right secured by the Constitution and laws of the United States.  42 U.S.C § 1983 (2012); West v. Atkins, 487 U.S. 42, 48 (1988). Here, the Equal Protection Clause of the Fourteenth Amendment provides "a right to be free from gender discrimination that is not substantially related to important governmental objectives."[7] Beardsley v. Webb, 30 F.3d 524, 529 (4th Cir. 1994)(citing Davis v. Passman, 442 U.S. 228, 234-35, 99 S.Ct. 2264, 2271 (1979)). "[C]ourts have held that intentional sexual harassment of

---

[6]   The Secretary determined "that it is in the best interest of the Department to separate [Pense] from [his] position." Termination Letter [ECF No. 20-1] at 15.
[7]   Although the Complaint mentions a violation of the Fourteenth Amendment Due Process Clause and State Constitution, Plaintiff has not put forth any facts to show that she was deprived of any liberty or property interests so as to violate the state or federal Due Process Clauses.

employees by persons acting under color of state law violates the Fourteenth Amendment and is actionable under § 1983." Id.

The prima facie elements of a Title VII[8] sexual harassment case apply in § 1983 sexual harassment suits. See Beardsley, 30 F.3d at 529 ("Courts may apply the standards developed in Title VII litigation to similar litigation under § 1983."); Gairola v. Com. of Va. Dep't of Gen. Servs., 753 F.2d 1281, 1285-86 (4th Cir. 1985). Zeinali contends that Pense's acts created a hostile work environment. Title VII is violated "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370 (1993)(quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 2405 (1986)) (internal citations omitted). In a hostile environment suit, the plaintiff must prove that:

> (1) the subject conduct was unwelcome;
>
> (2) it was based on the sex of the plaintiff;
>
> (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment.

---

[8]   Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1) (2012).

Spicer v. Com. of Va., Dep't of Corr., 66 F.3d 705, 710 (4th
Cir. 1995); see also Ocheltree v. Scollon Prods., Inc., 335 F.3d
325, 331 (4th Cir. 2003).  According to Pense, the evidence is
insufficient to show the second and third elements, which the
Court discusses below.

     1. Based on Sex of Plaintiff

    In order to constitute sexual harassment, a plaintiff must
prove he or she was discriminated against because of his or her
sex. See Ocheltree, 335 F.3d at 331 (quoting Oncale, 523 U.S.
75, 80, 118 S. Ct. 998, 1002 (1998))("The critical issue [in the
"because of sex" inquiry] is whether members of one sex are
exposed to disadvantageous terms or conditions of employment to
which members of the other sex are not exposed.").

    To satisfy this element, Zeinali claims that Pense was
interested in a physical, sexual relationship with her, as well
as a romantic relationship.  Pense contends that he is
homosexual, and therefore, he has no sexual or romantic interest
in Zeinali or any other woman.  Pense has submitted evidence to
this effect, including his own declaration that he has never
been in a romantic relationship with a woman.  Zeinali disagrees
that Pense is homosexual, and cites two pieces of evidence: (1)
Pense did not tell his coworkers that he is homosexual prior to
the start of this lawsuit, and (2) in his deposition, Pense

admitted that he had a drunken "sexual encounter" with a woman over thirty years ago.  Although it is debatable whether Zeinali has put forth significantly probative evidence to create a genuine dispute of fact on this point, the Court will proceed on the assumption that Pense is not homosexual.[9]  This is because, based on all of the evidence presented with all inferences made in favor of Zeinali, no reasonable juror could conclude that Pense's conduct constituted sexual advances, regardless of Pense's sexual orientation.

In the instant case, Zeinali identified the following as instances of Pense's "aggressive sexual advances in the workplace" or "sexualized banter":

- Pense asking her out to lunch more than once.
- Pense asking her to go hiking with him in New York.
- Pense touching her legs and chest when he was working near her on the computer.
- Pense saying he "enjoyed this" when he sat next to her.

---

[9]     The Supreme Court has stated that in male-female harassment cases, "it is reasonable to assume those proposals [of sexual activity] would not have been made to someone of the same sex. The same chain of inference would be available to a plaintiff alleging same-sex harassment, if there were credible evidence that the harasser was homosexual."  Oncale, 523 U.S. at 80. Evidence of Pense's sexual orientation could be relevant here in that it generally refutes the chain of inference that Pense's conduct was directed at Zeinali because of her sex, as is normally assumed in cases of male-female harassment.  However it is not necessary for the Court to reach this issue based on the facts of this particular case.

- Pense telling her she was "pretty" and talking about her hair, looks, or outfits approximately five to seven times.

Zeinali Dep. [ECF No. 15-2, Ex. D] at 36-37, 53. Zeinali also claims that the card Pense gave her was a "love letter" with "sexual innuendos." [ECF No. 19-1] at 23-24.

The evidence, in context, fails to show that Zeinali was singled out for discriminatory treatment because of her sex. Instead, the record shows that Pense was frustrated with Zeinali's performance as his new Assistant and was trying to develop a better working relationship – not a sexual one.

In Oncale v. Sundowner Offshore Servs., Inc., the Supreme Court warned courts to "not mistake ordinary socializing in the workplace . . . for discriminatory 'conditions of employment.'" 523 U.S. at 81, 118 S.Ct. at 1003.   In other words, there is no legal cause of action for unwelcome friendship.  Pense was friendly with male and female work colleagues and frequently invited them to go to lunch or do other activities with him outside of work; Zeinali was no exception. Decl. of Tekia Jackson [ECF No. 15-2, Ex. C] at 28, ¶ 8.  Moreover, he repeatedly told Zeinali that he did not want to date her.  See, e.g., [ECF No. 15-3, Ex. J] at 43.  Pense's intentions are made clear in the March 27 note, wherein he makes statements, such as, "I still have room in my heart for another little sister just like you," and "I am willing to put in the extra effort

into making our working relationship and our friendship grow   .
. . I want to know all about you; tell me about your daughter,
your latest shopping spree, or whatever." [ECF No. 15-3, Ex. Q]
at 64.   After reading the note, no reasonable juror could
determine that Pense was pursuing a sexual or romantic
relationship with Zeinali.

Additionally, the alleged touching was "incidental conduct
that was void of sexual overtones." Bonora v. UGI Utilities,
Inc., No. CIV.A. 99-5539, 2000 WL 1539077, at *4 (E.D. Pa. Oct.
18, 2000) (involving a defendant who purposefully touched the
plaintiff's arm when opening a door and brushed his body against
the plaintiff's buttocks on two to four occasions).   Zeinali
herself stated that on the two times Pense touched her legs, he
jumped back and acted like it was an accident, and that Pense's
body only brushed against Zeinali's chest when he was leaning
over her to show her something on the computer. [ECF No. 19-6]
at 3-4.   Title VII is not a tool to prevent any accidental or
minor physical contact in the office, nor was it meant to "reach
genuine but innocuous differences in the ways men and women
routinely interact with [each other]. The prohibition of
harassment on the basis of sex requires neither asexuality nor
androgyny in the workplace." Oncale, 523 U.S. at 81, 118 S. Ct.
at 1002-03.

Last, there is no evidence to show that Pense harbored general hostility toward women in the workplace.  Even when a defendant has not made sexual advances,

> [a] trier of fact may reasonably find discrimination, for example, when a woman is the individual target of open hostility because of her sex, or when "a female victim is harassed in such sex-specific and derogatory terms ... as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace."

Ocheltree, 335 F.3d at 331-32 (quoting Oncale, 523 U.S. at 80, 118 S.Ct. at 1002) (internal citations omitted).

Zeinali contends that the evidence shows that Pense treated women in the workplace differently than men because (1) he did not compliment male co-workers on their hair, (2) he remains in contact with two female colleagues, but no males, and (3) he did not give a male employee a card.

These facts do not show hostility to women.  There is no evidence of Pense using gender-specific derogatory terms or treating his female co-workers differently because of their sex. In Smith v. First Union Nat. Bank, the court found that the plaintiff's supervisor belittled her "because she was a woman" when the supervisor made comments such as, a woman who was upset "must be menstruating" or that she needed "a good banging"; the "only way for a woman to get ahead at First Union is to spread her legs";  women had no place in management and did not even

21

belong in college;  women should be "barefoot and pregnant." 202 F.3d 234, 243 n.6 (4th Cir. 2000). There is a complete absence of any similar insults in the record here.

 Pense's infrequent compliments about Zeinali's appearance (the compliments that Pense wrote made her "blush") were not gendered insults; nor did Zeinali ever ask him to stop mentioning her appearance.  Affidavits submitted by Pense's other Assistant and other female co-workers, demonstrate that Pense has never made any sexual or gendered insults to them, or treated them differently because of their gender.  See Nolet Decl. [ECF 15-2, Ex. A] at 18, ¶¶ 6-7; Decl. of Sue Dooley [ECF 15-2, Ex. B] at 23, ¶¶ 6-9; Jackson Decl. [ECF 15-2, Ex. C] at 27-28, ¶¶ 3-4; Decl. of Joselyn Hopkins [ECF 20-3] at 2, ¶ 7. In fact, Pense's closest work friendships were with females.

 The record also reveals that Pense and Zeinali had a tense working relationship, and that Pense scrutinized Zeinali's job performance.  However, there is no evidence to show that this scrutiny had anything to do with Zeinali being a woman. The evidence demonstrates that Pense distrusted Zeinali's integrity and her ability to do the required accounting tasks. See Pense Decl. [ECF No. 15-3] at ¶ 16; [ECF No. 15-3, Ex. L] at 49; see also Ziskie v. Mineta, 547 F.3d 220, 226 (4th Cir. 2008)("[H]arassment due to personality conflicts will not

suffice. Some persons, for reasons wholly unrelated to race or gender, manage to make themselves disliked.").

The Court concludes that a reasonable jury could not find that Pense's conduct was based on her sex.

### 2. Severe or Pervasive

Pense's conduct, even if it were found to be based on sex, must also be "sufficiently severe or pervasive" so as to alter the conditions of the work environment. Ocheltree, 335 F.3d at 331.  To determine whether a work environment is "hostile," the Court must look at all the circumstances, including:

    (1) the frequency of the discriminatory conduct;
    (2) its severity;
    (3) whether it is physically threatening or humiliating, or
        a mere offensive utterance; and
    (4) whether it unreasonably interferes with an employee's
        work performance.

Harris, 510 U.S. at 23.  A plaintiff must clear a "high bar" to establish this element. E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008).

The Court must examine the evidence from "both the subjective and objective perspectives." Ward v. Johns Hopkins Univ., 861 F. Supp. 367, 376 (D. Md. 1994). "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Oncale, 523 U.S. at 81, 118 S. Ct. at 1003 (quoting Harris, 510 U.S. at 23, 114 S.Ct. at 371).

The Court will assume that Pense's conduct subjectively created a hostile work environment for Zeinali. See Williams v. Silver Spring Volunteer Fire Dep't, 86 F.Supp. 3d 398, 412 (D. Md. 2015)("[C]ourts often assume the conduct is subjectively offensive."). However, the evidence does not demonstrate that, under the circumstances, a reasonable person in Zeinali's position would be significantly affected.

A reasonable juror could not label Pense's conduct – one unprofessional outburst, a personal card and letter, repeated lunch invitations, scrutiny at work, compliments on appearance, and brief touchings (even if purposeful) – as "physically threatening or humiliating" or "severe."  Zeinali has failed to point out any act that is fairly characterized as "severe."  Cf. Williams v. Silver Spring Volunteer Fire Dep't, 86 F. Supp. 3d 398, 413 (D. Md. 2015)(calling a single act "severe" when a supervisor approached the plaintiff at a meeting, straddled her waist, and grinded his pelvis on her in front of co-workers).

Although each case is different and must be judged on its own merits, a comparison to the facts of other sexual harassment cases shows how mild the conduct at issue in this case is. Compare Smith v. First Union Nat. Bank, 202 F.3d at 243 (finding a hostile workplace when defendant insulted plaintiff at least once a month, called her angrily at night, and made physical threats by saying "or else you'll see what will happen to you"

24

and that he would "slit a woman's throat"); Paroline v. Unisys
Corp., 879 F.2d 100, 103 (4th Cir. 1989), opinion vacated in
part on reh'g on other grounds, 900 F.2d 27 (4th Cir.
1990)(finding the issue of "severe and pervasive" to be a jury
issue when the defendant supervisor made sexually suggestive
remarks to the plaintiff, kissed her and rubbed his hands on her
back even when she asked him to stop, and forced his way into
her home for sexual reasons); with Raley v. Bd. of St. Mary's
Cty. Comm'rs, 752 F. Supp. 1272, 1275, 1280 (D. Md. 1990)
(conduct was not severe and pervasive where defendant
"uninvitedly placed his hand on [plaintiff's] thigh underneath
her dress," hugged and kissed other women in the office, and
made isolated sexual innuendos); Hale v. Vill. of Madison, 493
F.Supp. 2d 928, 938 (N.D. Ohio 2007) (finding that behavior was
not severe when intimidating outbursts did not occur regularly
and complaining plaintiffs could not articulate why they feared
for their safety, even when the defendant's conduct was found to
violate the municipality's sexual harassment policy).  In this
case, Pense never insulted or threatened Zeinali, made any overt
sexual references or acts, or unreasonably interfered with her
work performance in any way related to her sex.

The most notable evidence, the apology card and note, could
be characterized as unprofessional, but it could not reasonably

be called humiliating or threatening.[10]   Instead, when looking at the totality of the circumstances, it is apparent the note was another one of Pense's failed attempts at mere friendship.   The very language of the card makes this evident.

Zeinali may have felt overwhelmed by her work environment, but those feelings were attributable to Pense's dissatisfaction with her work performance, not gender-based discrimination, as evidenced by her messages to Ms. Keller.   "[C]allous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor are not actionable under Title VII."   Sunbelt Rentals, Inc., 521 F.3d at 315–16 (internal citations and quotations omitted).   Furthermore, mere disagreement "with the management style or decisions of [supervisors] . . . is not actionable under Title VII."   Thorn v. Sebelius, 766 F.Supp. 2d 585, 601 (D. Md. 2011), aff'd, 465 Fed. App'x 274 (4th Cir. 2012) (citing Webster v. Johnson, 126 Fed. Appx. 583, 588 (4th Cir. 2005) (noting that stern supervision does not evidence actionable harassment)).

After considering the relevant circumstances from an objective perspective, the Court concludes that a reasonable

---

[10]   Joselyn Hopkins, another DPSCS employee, stated in her affidavit that she once argued with Pense over a work-related matter.   The next day, Pense put a Hallmark greeting card in her in-box apologizing for his temper.   Hopkins and Pense thereafter resumed a cordial and professional relationship.   Hopkins Decl. [ECF No. 20-3] at 2-3.

fact-finder could not find that Pense's conduct created a hostile work environment.

### C. Qualified Immunity

Pense claims that he is entitled to qualified immunity as a state official.  Zeinali must show (1) that Pense violated her right to be free from gender discrimination, and (2) the right was clearly established at the time of the events at issue. See Graham v. Gagnon, 831 F.3d 176, 182 (4th Cir. 2016).  For the reasons stated above, Zeinali has failed to show a violation of her rights; therefore, Pense is entitled to qualified immunity.

### V.    CONCLUSION

For the foregoing reasons:

1. Defendant's Motion for Summary Judgment [ECF No. 15] is GRANTED.

2. Judgment shall be entered by separate Order.

SO ORDERED, this Tuesday, December 20, 2016.

_____/s/_____
Marvin J. Garbis
United States District Judge